# 14-1998-cv

## United States Court of Appeals
### *for the*
## Second Circuit

RAYMOND A. LONG, M.D.

*Plaintiff-Appellant,*

-v.-

QUORUM HEALTH RESCOURCES, LLC,
NORTHWESTERN MEDICAL CENTER, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT (BURLINGTON)

**BRIEF FOR DEFENDANTS-APPELLEES**

Verrill Dana LLP
One Portland Square
Portland, Maine 04112-0586
(207)774-4000

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................... ii

SUMMARY OF THE ARGUMENT ....................................................1

ISSUES PRESENTED.........................................................................4

STATEMENT OF FACTS ...................................................................5

    A. The 2004 Investigation and the NPDB Report ...............................5

    B. The 2005 Lawsuit.........................................................................6

    C. The Parry Action .........................................................................9

    D. The Current Action ....................................................................10

ARGUMENT ....................................................................................14

    I.   The District Court correctly dismissed Long's claims for libel and
       tortious interference on the basis of *Res Judicata*...........................14

    II.  The District Court correctly dismissed Long's claims for libel on
       the basis of invited harm...............................................................21

    III. The District Court correctly held that amendment of Plaintiff's
       Complaint would be futile. ...........................................................26

CONCLUSION .................................................................................31

CERTIFICATE OF COMPLIANCE....................................................32

APPENDIX A: Cross-Reference of Bowen Report to 2005 Action ......................33

# TABLE OF AUTHORITIES

## CASES

*Bellefonte Reinsurance Co. v. Argonaut*, 757 F.2d 523 (2d Cir. 1984) ........... 28, 29

*Bloch v. Temple Univ.*, 939 F. Supp. 387 (E.D. Pa. 1996) .....................................24

*Carlson v. Clark*, 970 A.2d 1269, 1274 (Vt. 2009) .................................................15

*Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*,
   544 F. Supp. 2d 178 (S.D.N.Y. 2008) ........................................................... 29, 30

*Farr v. St. Francis Hospital & Health Centers*,
   No. 1:06-cv-779, 2007 WL 2793396 (S.D. Ind. Sept. 26, 2007).......................24

*Faulker v. Caledonia Cnty. Fair Ass'n*, 869 A.2d 103 (Vt. 2004) .................. 14, 15

*Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394 (1981)..................................15

*Heike v. Guevera*, No. 09-10427-BC,
   2010 WL 538300 (E.D. Mich. Feb. 9, 2010) ....................................................24

*Heller v. Consol. Rail Corp.*, 331 F. App'x 766 (2d Cir. 2009) .............................26

*Holmes v. Grubman*, 568 F.3d 329 (2d Cir. 2009) .................................................26

*Klein v. Banknorth Grp., Inc.*, 977 F. Supp. 302 (D. Vt. 1997) ...............................7

*Lamb v. Geovjian*, 683 A.2d 731 (Vt. 1996) ..........................................................21

*Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322 (1955)................................ 16, 17

*Legnani v. Alitalia Linee Aeree Italiane, S.p.A.*,
   400 F.3d 139 (2d Cir. 2005) ...............................................................................16

*Lent v. Huntoon*, 470 A.2d 1162 (Vt. 1983)...........................................................25

*Monahan v. New York City Dep't of Corr.*, 214 F.3d 275 (2d Cir. 2000) ..............20

*Nevada v. United States*, 463 U.S. 110, 130 (1983) ...............................................15

*Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634 (2d Cir. 1989) ....... 19, 20

*Nott v. Stoddard*, 38 Vt. 25 (1865)..........................................................................24

*Parker v. Columbia Pictures Indus.*, 204 F.3d 326 (2d Cir. 2000) ........................26

*Pomfret Farms Ltd. P'ship v. Pomfret Assocs.*, 811 A.2d 655 (Vt. 2002)..............14

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) ......................................................7

*Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129 (2d Cir. 1993) ................................27

*Silva v. Stevens*, 589 A. 2d 852 (Vt. 1991) ............................................................27

*Sure-Snap Corp. v. Bradford Nat. Bank*, 128 B.R. 885 (D. Vt. 1991)....................15

*Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869 (2d Cir. 1991)........15

*The Standard Fire Ins. Co. v. Donnelly*, 689 F. Supp. 2d 696 (D. Vt. 2010)..........26

*Tyson v. Cayton*, 784 F. Supp. 69, 75 (S.D.N.Y. 1992) ..........................................30

*Waldman v. Village of Kiryas Joel*, 39 F. Supp. 2d 370 (S.D.N.Y. 1999) ....... 18, 19

*Waldman v. Village of Kiryas Joel,* 207 F.3d 105 (2d Cir. 2000) ................... 18, 19

*Weisburgh v. Mahady*, 511 A.2d 304 (Vt. 1986)....................................................25

*Yaba v. Roosevelt*, 961 F. Supp 611 (S.D.N.Y. 1997)............................................20

## STATUTES AND OTHER AUTHORITIES

45 CFR § 60.11(a)(1)(ii)(A) .......................................................................................6

Prosser & Keeton on the Law of Torts § 114 (5th ed. 1984)...................................24

Restatement (Second) of Judgments § 24(2) ..........................................................15

Restatement (Second) of Torts § 584....................................................................25

## SUMMARY OF THE ARGUMENT

The District Court is no stranger to this action's parties or claims.  On two

separate occasions starting in 2005, Appellant Dr. Raymond A. Long ("Long")

commenced actions before the District Court challenging aspects of a peer review

undertaken by Appellee Northwestern Medical Center ("NMC"), where Long was

a member of the surgical staff.  In the first action, commenced against NMC,

Quorum Health Resources ("QHR") and members of NMC's medical staff, Long

alleged that NMC's peer review investigation was a sham and that the patient

infections that had, in part, led to the peer review were the result of intentional

contamination by NMC.  The 2005 action also challenged a 2004 adverse action

report ("AAR") arising out of the peer review that was filed by NMC with the

National Practitioner Databank ("NPDB").  After the 2005 action was settled at

mediation, Long sued the lawyers who represented him in that action claiming

malpractice for, among other things, failing to secure a higher settlement payment

or to get NMC to agree to withdraw the AAR as part of the settlement.

Now Long brings this action, which arises out of Long's 2011 request that

the Secretary of Health and Human Services review the AAR filed by NMC in

2004.  Long claims that NMC defamed him when it responded to the Secretary's

request for information by providing the Secretary with documents supporting the

AAR, which were the same documents that were at issue in Long's 2005 action

1

against NMC.  Long also claims that, in refusing to withdraw the AAR or acceding to his contention that the AAR was improper and illegal, NMC tortiously interfered with his ability to gain employment.

The District Court correctly concluded that Long's claims are barred as *res judicata* under the "transactional" test that has been adopted by Vermont and Second Circuit courts.  Each of the alleged defamatory statements was addressed in the 2005 action, as was the legitimacy of the AAR itself.  Moreover, withdrawal of the AAR, which was the very purpose of Long's request for review and NMC's statements to the Secretary in response thereto, was also directly at issue in Long's earlier action against QHR and NMC.  The fact that the NMC made its submission to the Secretary after the conclusion of the 2005 action is irrelevant.  Long's current claims are "related in time, space, origin, or motivation" to those asserted in 2005, and are thus barred.

Long's defamation claim is also barred under the doctrine of invited harm, a variant of the rule that one who consents to defamation has no claim when the defamatory statements are made.  When he sought Secretarial review, Long knew that NMC would be queried for information substantiating the reportability of the AAR and that, should the Secretary uphold the AAR, a notation would be added to the AAR indicating as much.  Long was also informed that the Secretary would not review the issue that was the basis for his request — whether NMC's peer review

2

was a "sham" or legitimate.  Nonetheless, Long proceeded with the review.  Under those circumstances, Long invited NMC's statements and his claim for defamation is barred.

The District Court also correctly denied Long's motion for leave to amend his complaint to assert a claim for deceit based on NMC's alleged failure to produce in the 2005 action the results of a culture taken by Long in December 2003.  As recognized by the District Court, a claim for deceit fails where the misrepresentation at issue was "open to the defrauded party's knowledge." Because Long took the culture himself, the existence of the culture results was clearly open to his knowledge, and thus amendment to add the claim for deceit would have been futile.  Moreover, the claim for deceit was released by Long when he settled the 2005 action, and thus amendment would have been futile on that basis as well.

In short, the District Court's ruling was correct in all respects and should be affirmed.

# ISSUES PRESENTED

1.      (a)  Did the District Court correctly hold that Long's claim for libel is barred by the doctrine of *res judicata* because that claim arose out of the same "transaction," as that term has been construed in binding precedent, as Long's prior action against defendants NMC and QHR?

Answer:      Yes.

(b)  Did the District Court correctly hold that Long's claim for tortious interference with prospective business advantage is barred by the doctrine of *res judicata* because that claim arose out of the same "transaction," as that term has been construed in binding precedent, as Long's prior action against defendants NMC and QHR?

Answer:      Yes.

2.      Did the District Court correctly hold that Long's claim for libel is barred by the doctrine of invited harm because Long precipitated and consented to the release of the allegedly libelous statements?

Answer:      Yes.

3.      Did the Court correctly deny Long's motion to amend the First Amended Complaint on the grounds of futility?

Answer:      Yes.

## STATEMENT OF FACTS

Appellee NMC is a not-for-profit, primary care hospital located in St. Albans, Vermont.  (A-241 (Amended Complaint ("FAC") ¶ 3).)  Appellee QHR provides management advisory services to NMC, and was sued vicariously on that basis.  (A-241 (FAC ¶ 6).)  Long is an orthopedic surgeon who was an active member of NMC's surgical staff from 2001 to 2004.  (A-242 (FAC ¶ 10).)

### A.    The 2004 Investigation and the NPDB Report[1]

In March 2004, NMC's Chief Executive Officer notified the President of NMC's Medical Staff of various reports relating to Long's behavior while on staff at NMC.  (A-50.)  He asked the Medical Staff to review the reports and determine if corrective action was appropriate.  (*Id.*)  An Ad Hoc Committee of the Surgical Service was convened to review the reports of Long's conduct and recommended certain remedial actions, including an "independent evaluation of Long's emotional and psychiatric health."  (A-51-52.)

The Medical Executive Committee reviewed and adopted the recommendations of the Ad Hoc Committee.  The Medical Executive Committee

---

[1] The following summary of events is derived from documents attached as Exhibit B to Long's original Complaint (A-33-67).  The FAC — which is the operative Complaint — incorporates the exhibits to the original Complaint by reference (A-244 (FAC ¶ 21); A-248 (FAC ¶ 48)), but does not attach them.  Accordingly, cites to exhibits to the FAC direct the Court to the exhibits to the original Complaint in the Appendix.

then referred the matter to NMC's Board of Directors, which approved the decision.  (A-53-54.)  On April 6, 2004, NMC informed Long of the adopted recommended corrective actions and of his right to request a hearing to address the corrective actions.  (A-55-56.)  The April 6 letter stated that proceedings related to the recommenced corrective action "are held in confidence under the peer review committee requirements" of the Medical Staff Bylaws, but that "we will be required to report the adverse recommendation to the Vermont Medical Practice Board."  (*Id.*)  The following day, Long resigned from the NMC staff.  (A-58.)  Long did not avail himself of the hearing process.

Applicable regulations require health care entities to report to the NPBD[2] all surrenders of clinical privileges "[w]hile a physician or dentist is under investigation by the health care entity relating to possible incompetence or improper professional conduct."  45 CFR § 60.11(a)(1)(ii)(A).  Because Long had resigned from NMC while the investigation into his actions and behavior was pending, NMC filed an AAR with the NPDB on April 30, 2004.  (A-41.)

### B.    The 2005 Lawsuit

On January 24, 2005, Long filed a complaint in the United States District Court for the District of Vermont against QHR, NMC and three doctors associated

---

[2] The NPDB is a confidential information clearinghouse created by Congress. Upon request, the NPDB provides adverse action information to state licensing boards, hospitals, and other specified organizations.

with NMC and involved in the investigation into Long's behavior while on the NMC staff. (A-71 (*Long v. Quorum Health Resources, LLC et al.*, No. 2:05-cv-21-wks (D. Vt.) (Sessions, J.) (the "2005 Action" and the "2005 Compl.").).)[3] Long amended his Complaint on September 28, 2006 ("2006 Am. Compl.").[4] The 2005 and 2006 Amended Complaints detailed various incidents that allegedly occurred while Long was on the Medical Staff at NMC, including complications involving certain of Long's patients and confrontations with other NMC Medical Staff members regarding patient care and hospital procedures.

Much of the 2005 and 2006 Amended Complaints were devoted to challenging the legitimacy of the 2004 peer review process, which was the basis for NMC's filing of the AAR. Thus, the 2005 and 2006 Amended Complaints allege, among other things:

- NMC's Chief Executive Officer "wrongly and without justification" referred Long to NMC's Medical Staff for review and potential corrective action (A-117 (2005 Compl. ¶ 317); 2006 Am. Compl. ¶ 392);

---

[3] The District Court was permitted to take judicial notice of the 2005 Complaint. *See, e.g. Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of complaint filed in another action pursuant to Fed. R. Evid. 201(b)); *Klein v. Banknorth Grp., Inc.*, 977 F. Supp. 302, 305 (D. Vt. 1997) (taking judicial notice of complaint filed in state court).

[4] Only the January 24, 2005 complaint is included in the record. However, the District Court relied on (and cited to) Amended Complaint, which Appellant has agreed to provide to the Court upon request (App. Br. at 27 n.8). This brief will cite to both complaints.

- An Ad Hoc Committee was formed to review the situation and, after meeting, "wrongfully and without basis" recommended certain actions to address Long's allegedly disruptive and problematic behavior A-118 (A-118 (2005 Compl. ¶ 323); 2006 Am. Compl. ¶ 436); and

- NMC's letter of April 6, in which it informed Long of the adopted corrective actions and advised Long of his hearing rights, constituted "a serious reduction of Dr. Long's Active Staff Privileges." (A-119 (2005 Compl. ¶ 329-32); 2006 Am. Compl. ¶ 473.)

The 2005 and 2006 Amended Complaints also challenged the filing of the AAR based on Long's resignation while under peer review.  Long alleged that the filing of the AAR was "wrongful, illegal and unwarranted" and impaired his ability to practice, maliciously branded him as a "problem doctor" and "virtually eliminated" his ability to obtain employment as an orthopedic surgeon.  (A-122 (2005 Compl. ¶ 345-46); 2006 Am. Compl. ¶ 488.)  The 2005 and 2006 Amended Complaints assert numerous causes of action allegedly arising out of this series of events, including tortious interference with prospective business advantage, defamation, libel per se and slander, false light and outrage.

After three years of hard-fought litigation,[5] the 2005 Action was resolved at mediation.  (A-147 (Early Neutral Evaluation Evaluator's Report).)  Thereafter, the parties executed a General Release of All Claims pursuant to which Long released NMC and QHR

---

[5] The 386 docket entries in the case reflect the parties' vigorous litigation of the 2005 Action.

> from all causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, costs, loss of income, interest, delay damages, compensation, punitive damages, and any and all *claims* and demands whatsoever, in law or equity, including but not limited to claims that I made or could have made in the [2005 Action].

(A- 237 (General Release of All Claims).)  Long further agreed he was

> releasing all claims against the Releasees, including Medical Mutual . . . *related or unrelated to the [2005] Action*, up to and as of the date I sign this release.  I recognize that I may have some claims or causes of action against Releasees of which I am totally unaware and unsuspecting.  I understand that I am giving up such claims by execution of this release.  It is my intention by executing this release that the release will deprive me of all claims and causes of action against the Releasees, and that henceforth I will not be allowed to assert such claims or causes of action against Releasees or to file suit against the Releasees on such bases. . .

(A-237-38.)

The General Release did not require NMC to void the AAR, nor did it contain a confidentiality requirement or non-disparagement provision.  (*Id.*)  A stipulation of dismissal with prejudice was filed on September 5, 2008.  (A-148.)

### C.    The Parry Action

On April 24, 2012, Long filed a complaint (the "Parry Complaint") in the United States District Court for the District of Vermont against Lloyd Parry and Davis, Parry & Tyler, P.C., the lawyer and law firm that represented Long in the 2005 Action, for malpractice and breach of fiduciary duty.  (A-155-213 (*Long v.*

*Parry*, No. 2:12-cv-81 (D. Vt.) (Sessions, J.) (the "Parry Action" and the "Parry Compl.").)

Among other things, Long alleged that Parry's representation was inadequate because he did not obtain NMC's agreement to void the AAR as part of the settlement of the 2005 Action.  Long alleges that he "told Parry to require NMC to do whatever was necessary so that NMC would void its report to the National Practitioner Data Bank regarding Dr. Long" (A-182 (*id.* ¶ 249)), but that Parry told Long that that he could not ask NMC to void the report and that such a request would prevent a settlement from being reached.  (A-182 (*Id.* ¶¶ 251-52).) Long alleges that "[b]ased on Parry's above advice . . . Dr. Long agreed to settle [the 2005 Action] for $4,000,000 without any requirement that NMC void its report to the National Practitioner Data Bank regarding Dr. Long."  (A-183 (*Id.* ¶ 259).)  Long alleges that at the January 5, 2008 mediation, the 2005 Action was settled "in writing" and "without any requirement that NMC void its report."  (A-183 (*Id.* ¶ 260).)

### D.    The Current Action

The FAC in this action alleges that on August 29, 2011 — over seven years after filing of the AAR and three years after the 2005 Action was settled — Long wrote to NMC to request that NMC void the AAR.  (A-247 (FAC ¶ 44), A-34 (Ex. B).)  NMC declined to void the report in response to Long's request.  (A-247 (FAC

¶ 45), A-35 (Ex. B).)   Approximately two months later, Long petitioned the

Secretary of Health and Human Services (the "Secretary"), who oversees the

NPDB, to review the AAR by filing a Request for Secretarial Review.  (A-248

(FAC ¶ 46); A-36 (Ex. B).)

On its face, the Request for Secretarial Review form specified the scope of

the Secretary's review of the AAR:

> The Secretary will not review the . . . basis for an adverse
> action or judgment or conviction.  The Secretary can only
> determine if the action was reportable and if the report
> accurately describes the action and the reasons the action
> was taken.  The Secretary cannot review the extent to
> which entities followed due process guidelines.

(A-38 (FAC Ex. B).)

The Secretary acknowledged receipt of Long's review request by letter dated

December 2, 2011.  (A-42-44 (FAC Ex. B).)  In that letter, the Secretary informed

Long that the she would review the record and request additional information as

necessary from Long and the "reporting entity," NMC.  (*Id.* at A-42.)  In addition,

the letter reiterates the scope of the Secretary's review:

> The Secretary cannot determine whether a reporter's
> decision to take an action concerning licensure,
> privileges, exclusions, etc., was correct or fair.  The
> Secretary can *only* determine (1) if the report is legally
> required or permitted to be filed and (2) if the report
> accurately depicts the action taken and the reporter's
> basis for the action *as reflected in the written record.*

11

> If we determine that your request for Secretarial Review involves only your contention that the reporting entity was wrong to take action against you, that it acted unfairly . . . a decision to retain the report will be entered, and a Secretary's statement will be added to the report noting the Secretary's limited jurisdiction and explaining the issues that you raised were "outside the scope of review." *If your case involves only these issues, you may wish to withdraw your request for Secretarial Review to avoid having the Secretary's statement added to the report.*

(*Id.* at A-43 (emphasis added).)

In response to Long's request for review, the Secretary sent a letter to NMC asking that NMC produce information regarding the "sequence of events that led Northwestern to report Dr. Long to the NPDB, and provide copies of documentation to support your explanation." (A-248 (FAC ¶ 47); A-45-46 (FAC Ex. B).) NMC responded to the Secretary's request on January 31, 2012 (the "Bowen Report"). (A-248 (FAC ¶ 48); A-47-58 (FAC Ex. B).)

The Bowen Report, which is attached to the Complaint, consists of three pieces: (i) a cover letter from NMC CEO Jill Berry Bowen (A-47)); (ii) a chronology of events, also drafted in 2012 (A-48-49), and (iii) documents referenced in and supporting the chronology, each dated in 2004 (A-50-58)). The FAC does not allege that either the cover letter or the chronology contain defamatory statements. Instead, the allegedly defamatory statements are contained in the documents Bowen attached to her letter and chronology. Significantly, each

12

and every one of those documents was created before *and addressed in* the 2005 Complaint.[6]

On February 27, 2012, the Secretary responded to Long's request for review of the AAR.  (A-59-64 (FAC Ex. B).)  The Secretary determined that "there is no basis to conclude that the Report should not have been filed in the NPBD or that the Report is not accurate.  Your request that the Report be voided from the NPBD is hereby denied."  (A-59.)

Consistent with the Secretary's December 2, 2011 letter, the Secretary added a notation to the AAR stating that Long requested the Secretary's review of the AAR, summarizing the standard utilized by the Secretary in evaluating Long's request, and noting that "the Secretary determined that there is no basis to conclude that the report should not have been filed or that for agency purposes it is not accurate . . ."  (A-67 (FAC Ex. C).)

Long subsequently filed the instant action, claiming that the Bowen Report was defamatory and that, by causing the NPBD to both maintain the AAR and add a notation regarding the unsuccessful request for Secretarial review, NMC interfered with Long's prospective business opportunities.

---

[6] Appendix A, attached hereto, cross-references each of the events and documents referenced in the Bowen Report to allegations in the 2005 Action.

## <u>ARGUMENT</u>

**I.    THE DISTRICT COURT CORRECTLY DISMISSED LONG'S CLAIMS FOR LIBEL AND TORTIOUS INTERFERENCE ON THE BASIS OF *RES JUDICATA*.**

The current action is Long's third relating to the 2004 peer review of his actions while a surgeon at NMC and the AAR that NMC filed as a result.  This action, like the 2005 Action against NMC and QHR, depends upon the legitimacy of that peer review and whether — as Long incredibly suggests — NMC intentionally infected its own patients in order to discredit Long.  In short, this action and the 2005 Action are related in "time, space, origin [and] motivation," *Faulker v. Caledonia Cnty. Fair Ass'n*, 869 A.2d 103, 108-109 (Vt. 2004), and the District Court was correct to find Long's current claims barred by the doctrine of *res judicata*.

Stated most simply, *res judicata* bars the re-litigation of claims where the parties, subject matter and causes of action were the subject of a final judgment on the merits.  *See Pomfret Farms Ltd. P'ship v. Pomfret Assocs.*, 811 A.2d 655, 659 (Vt. 2002).  The doctrine promotes the "efficient and fair administration of justice" and

> ensures "the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. . ."

14

*Faulkner*, 869 A.2d at 107-08 (quoting *Nevada v. United States*, 463 U.S. 110, 130 (1983)). Similarly, it ensures that "those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." *Id.* at 108 (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981)).

Vermont courts, like the Second Circuit Federal Courts, have adopted the "transactional test" for determining whether a subsequent action is barred by the doctrine of *res judicata. See id; see also Carlson v. Clark*, 970 A.2d 1269, 1274 (Vt. 2009); *Sure-Snap Corp. v. Bradford Nat. Bank*, 128 B.R. 885, 890 (D. Vt. 1991) *aff'd sub nom. Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869 (2d Cir. 1991). Under this test, courts look to "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations." *Faulkner*, 869 A.2d at 109 (citing Restatement (Second) of Judgments § 24(2)).

There is little question that the facts alleged in this action and the 2005 Action are related in time, space and origin. Both actions center on the events leading to the 2004 peer review and whether (i) the peer review was a sham commenced by individuals who knew or should have known that Long's patients had been intentionally infected by NMC *or* a legitimate investigation into Long's behavior and the infections of his patients (A-217-220 (FAC ¶¶ 29-42); A-117-121

15

(2005 Compl. ¶¶ 317-341); 2006 Am. Compl. ¶¶ 411-76 ); and (ii) NMC's filing of the AAR was improper and "illegal" *or* justified (and indeed required) by Long's resignation during a pending peer review investigation (A-220 (FAC ¶¶ 42-44); A-122 (2005 Compl. ¶¶ 344-46); 2006 Am. Compl. ¶ 486-87).  Moreover, both the FAC and the 2005 Complaint assert causes of action for defamation and tortious interference based on NMC's filing of the AAR.  (A-250-55 (FAC ¶¶ 52-92); A-128-29, 139 (2005 Compl. ¶¶  377-87, 437-40); 2006 Am. Compl. ¶¶ 524-534, 545-54, 572-87.)

Long argues that *res judicata* cannot bar his current claim of libel because the allegedly libelous statements were made after the filing of the 2005 Action. Plaintiff relies on caselaw standing for the uncontroversial proposition that *res judicata* generally does not bar claims that did not exist at the time of the filing of first complaint and "could not possibly have been sued upon in the previous case." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955).  Long discusses, at length, this Court's decisions in *Lawlor* and *Legnani v. Alitalia Linee Aeree Italiane, S.p.A.*, 400 F.3d 139 (2d Cir. 2005).

But these cases are wholly distinguishable and do nothing to undermine the District Court's application of *res judicata* in this case.  In *Legnani*, the plaintiff filed a Title VII action against her employer.  Three years after the action was filed, but while it was still pending, the plaintiff was fired.  The plaintiff sought to

16

amend her complaint to add a cause of action for retaliatory discharge, but the court denied that request. Thus, in *Legnani*, unlike in this case, the plaintiff could not have litigated a claim for retaliatory discharge in her initial action because she was still employed at the time that action was filed and because the court denied leave to amend her complaint after she was fired.[7]

Unlike the plaintiffs in *Legnani* and *Lawlor*, who could not have asserted their claims at the time of their original complaints, Long could and did litigate whether reporting his resignation to the NPDB constituted libel and tortious interference. Long also fully litigated whether the documents that were attached to the Bowen Report were part of a valid peer review, or were defamatory and reflect an attempt to avoid a "true investigation of the cause of the infections of [Long's] patients." (A-219 (FAC ¶ 41).) The only difference between the information filed by NMC with the NPBD in 2004, which was at issue in the 2005 Action, and the Bowen Response is that the 2004 filing allegedly did not include the individual documents attached to the Bowen Report. But the allegedly defamatory nature of

---

[7] In *Lawlor*, the parties settled anti-trust claims by a settlement agreement that required the defendants to furnish the plaintiffs with products for plaintiff's distribution and sale. In a subsequent action, the plaintiffs claimed that the defendants failed to abide by the settlement agreement by making deliberately slow and erratic deliveries of the products and that defendants recruited five additional parties to join their anti-trust conspiracy. The Court held that the second action was not barred because all of the conduct complained of was subsequent to the first action and because the plaintiffs were complaining of entirely new and distinct anti-trust violations. 349 U.S. at 328.

the two reports are identical:  both reports indicate that a legitimate peer review

had been conducted into Long's behavior and that Long resigned while that review

was pending.  As the District Court concluded:

> Here, any injuries arising out of post-2008 queries to the
> NPBD by, for example, Dr. Long's potential employers,
> clearly arose out of the same core of operative facts as
> the settled claims and are not actionable.  As to any
> injuries caused by the Bowen Report, those events also
> arose out of the same core of facts as the 2005 Case.

(A-271 (Op. at 15).)

Moreover, and contrary to Long's assertion, the District Court correctly

applied the law of Vermont and this Circuit in holding that *res judicata* can bar

claims arising from events occurring after the filing of the initial action.  In

*Waldman v. Village of Kiryas Joel*, 39 F. Supp. 2d 370, 377 (S.D.N.Y. 1999), *aff'd*,

207 F.3d 105 (2d Cir. 2000), residents of the ultra-orthodox village of Kiryas Joel

who had been expelled from the village's synagogue alleged that village officials

barred them from public housing, committed other acts of religious discrimination

and were generally harassing as a result of their expulsion.  The village moved to

dismiss the claims on *res judicata* grounds because an earlier action brought by

many of the same residents had challenged many of the same practices.  The

plaintiffs objected, arguing that certain of the events, including barring plaintiffs

from holding a demonstration and barring one of the plaintiff's candidacy for

public office, *occurred after filing of the first action*.

The district court rejected this argument, holding that *res judicata* barred the second action. The court reasoned that "courts have consistently applied *res judicata* to claims extending over time or involving seriatim transactions and events so long as they are sufficiently related." *Id.* at 379. "[T]he pleading of subsequent acts will not defeat *res judicata* when these additional facts arise from the same core of operative facts." *Id.*

As Long goes to great pains to point out, the District Court relied on the Southern District's decision in *Waldman*. However, this Court affirmed that decision in its entirety, and like the District Court, found the plaintiffs' claims barred by *res judicata* despite the fact that that certain of the events allegedly giving rise to the plaintiffs' discrimination occurred after filing of the first action, including the passage of an allegedly discriminatory ordinance. *Waldman*, 207 F.3d at 110, 114. The Court held that these new facts were not sufficient to overcome *res judicata* because the new facts were "nothing more than additional instances of what was previously asserted." *Id.* at 113.[8]

---

[8] In *Norman v. Niagara Mohawk Power Corp*., 873 F.2d 634 (2d Cir. 1989), the plaintiff, an employee at defendant's nuclear power plant, claimed that he was harassed and intimidated because he attempted to bring various violations at the plant to the attention of management and regulators. After dismissal of two complaints filed with the Department of Labor, the plaintiff filed an action asserting various claims based on actions by the defendants occurring both before and after his DOL complaints were filed. The court dismissed the complaint on *res judicata* grounds, noting that "[a]lthough some of the acts of which Norman complains may have occurred [after dismissal of the earlier actions], it is readily

Long strains to distinguish these cases by arguing that, unlike the claims at issue in *Waldman*, *Norman* and the like, his claims do not arise out of the same "operative facts" because they relate to the publication of "new and different defamatory statements."  (App. Br. at 32.)  This is simply not the case.  As established repeatedly above, the statements Long complains of here are *the very same* statements that were at issue in the 2005 Action.  Moreover, the consequences and damages of which Long complains — the maintenance of the AAR — was also squarely at issue in the 2005 Action, as evidenced by the allegations in the 2005 Complaint (A-122, 144-45 (2005 Compl. ¶¶ 344-46, 462-66); 2006 Am. Compl. ¶¶ 486-87, 609-13) and the *Parry* Action (Parry Am. Compl. ¶¶ 354-57, 313-17).

In short, by his current action, Long is trying to obtain the relief he sought, but failed to obtain, in 2008.  If *res judicata* is not held to bar Long's claim, nothing will prevent Long from repeatedly challenging his AAR and then suing NMC each time it responds to substantiate the AAR's reportability.  Such tactics

---

apparent that they were all part of the same cause of action and arose from a single core of operative facts."  *Id.* at 638.  *See also Yaba v. Roosevelt*, 961 F. Supp 611, 622 (S.D.N.Y. 1997) (holding that sexual harassment and racial bias claim barred by *res judicata* despite fact that certain alleged instances of bias post-dated prior action); *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 289-90 (2d Cir. 2000) (correction officers' challenge to department's sick leave policy was barred by *res judicata* despite fact that policy was applied after judgment in the prior action because "[t]he hundreds of new incidents about which plaintiffs now complain fall within the same queue as those of injured officers who" filed first action).

are precisely what *res judicata* is intended to prevent.  As the Vermont Supreme

Court so aptly stated:

> The public interest in repose and finality is particularly
> acute in situations such as the present matter, in which an
> unsuccessful defendant in a professional-misconduct
> case, after stipulating to a settlement of the charges,
> attempts to relitigate the charges in a collateral attack
> against the public officials who investigated and
> preferred the charges.

*Lamb v. Geovjian*, 683 A.2d 731, 736 (Vt. 1996).[9]  For these reasons, the District

Court's ruling should be upheld.

## II.    THE DISTRICT COURT CORRECTLY DISMISSED LONG'S CLAIMS FOR LIBEL ON THE BASIS OF INVITED HARM.

To the extent any of the statements in the Bowen Report are defamatory,

Long invited those statements when he sought review of the AAR, absolving NMC

of liability for their contents.  Long has three, equally erroneous arguments to

avoid application of the rule of invited harm: (i) that he did not invite the harm

because he could not have anticipated that NMC would respond to his request for

Secretarial review by documenting the basis for its original decision to file the

---

[9] *Lamb* involved a subsequent action by a veterinarian against a member of the
State Veterinary Board challenging aspects of the Board's earlier investigation into
the plaintiff's alleged unprofessional conduct, and asserting defamation claims and
tortious interference claims against the Board member.  The defamation claim,
which was based on statements made by the Board member after settlement of the
prior proceeding, was not before the Supreme Court.  However, the Court held that
*res judicata* barred the tortious interference claim.

21

AAR; (ii) that Vermont has not adopted the doctrine of invited harm; and (iii) even if Vermont has adopted the doctrine of invited harm, his request for Secretarial review falls within an exception to that doctrine. Each argument fails.

First, Long cannot credibly assert that he should not have anticipated that NMC would respond to the Secretary's query by substantiating the original AAR. During the three years Long spent litigating the appropriateness of the peer review and the AAR, NMC strenuously maintained that the AAR was properly filed and did not agree to avoid the AAR as part of the parties' settlement. (A-192 (Parry Compl. ¶310).) In addition, Long sought NMC's agreement to void the AAR before seeking Secretarial review, but NMC rejected that request. (A-34-35 (FAC Ex. B).)

Long also knew (or should have known) that his request for review would not be successful, since the Request for Secretarial Review form and correspondence from the NPDB made clear that the Secretary's review would not address the merits of the AAR, i.e. whether the review undertaken by NMC was a valid peer review or a sham investigation:

> The Secretary will not review . . .the appropriateness of or basis for an adverse action . . . The Secretary can only determine if the action was reportable and if the report accurately describes the action and the reasons the action was taken.

(A-38 (FAC Ex. B); A-43 (FAC Ex. B).)  Moreover, these documents also warned

Long that if his appeal was not successful, a statement would be added to his AAR

indicating that he had requested a review and that the original AAR had been

upheld:

> If we determine that your request for Secretarial Review
> involves only your contention that the reporting entity
> was wrong to take action against you, that it acted
> unfairly . . . a decision to retain the report will be entered,
> and a Secretary's statement will be added to the report
> noting the Secretary's limited jurisdiction and explaining
> the issues that you raised were "outside the scope of
> review."

(A-43 (FAC Ex. B).)  Thus, Long was warned that

> *If your case involves only these issues, you may wish to*
> *withdraw your request for Secretarial Review to avoid*
> *having the Secretary's statement added to the report.*

(*Id.*) (emphasis added).)  Yet, despite these various warnings, Long proceeded with

his request for Secretarial review, thereby inviting NMC's statements and the

additional notation to his AAR that resulted.  As the District Court concluded, "Dr.

Long was on notice that his request for review could precipitate both the Bowen

Report and the Secretary's subsequent statement on the AAR."  (A-274 (Op. at

18).) [10]

---

[10] Indeed, Long's interpretation of applicable law would put NMC in an untenable
Catch-22:  either respond to the Secretary and get sued by Long, or decline to
respond thereby abdicating its obligation under HCQIA.  Long argues that NMC
would face no penalties for failure to respond to the Secretary's request for

Second, although Long is correct in noting that, other than in an inapplicable 1865 decision,[11] no Vermont court has addressed the privilege applicable in the case of invited harm (App. Br. at 35-36), there is no reason to believe that the Vermont Supreme Court would not adopt the privilege, which has been applied by courts across the country.[12]   The doctrine of invited harm is simply a variant of the long-established rule that consent is a defense to defamation.   *See* Prosser & Keeton on the Law of Torts § 114 (5th ed. 1984).   Moreover, although the Vermont Supreme Court has not explicitly adopted the Restatement's invited harm rule, it has adopted the Restatement's defamation principles more generally.   *See,*

---

information because the statute imposes penalties only for failing to report, not for failing to later substantiate a report under review.  (App. Br. at 39 n.12.)  Long's interpretation of HCQIA would completely undercut the purpose of the Act, which is to ensure that the NPBD contains reports of all relevant adverse events.

[11] In *Nott v. Stoddard*, 38 Vt. 25, 31 (1865) (App. Br. at 35), the Supreme Court held that the defendant was not absolved of liability for making defamatory statements in response to the question of whether he was the source of the rumor that the plaintiff had stolen firewood.   However, unlike in *Nott*, where the question posed by the plaintiff was only whether the defendant was the source of the defamatory statements, as discussed below, Long, in requesting Secretarial review, knew that NMC would be asked to substantiate or repeat the basis for its report to the NPDB.

[12] *See Heike v. Guevera*, No. 09-10427-BC, 2010 WL 538300 (E.D. Mich. Feb. 9, 2010) (holding that plaintiff invited allegedly defamatory statements made during appeal committee sought by plaintiff); *Farr v. St. Francis Hospital & Health Centers*, No. 1:06-cv-779, 2007 WL 2793396 (S.D. Ind. Sept. 26, 2007) (holding that plaintiff invited allegedly defamatory statements by initiating a grievance proceeding to challenge his termination); *Bloch v. Temple Univ.*, 939 F. Supp. 387 (E.D. Pa. 1996) (finding plaintiff invited allegedly defamatory statements made during tenure review process).

*e.g., Lent v. Huntoon*, 470 A.2d 1162, 1169 (Vt. 1983) (adopting the Restatement privilege for the protection of legitimate business interests); *Weisburgh v. Mahady*, 511 A.2d 304, 306 (Vt. 1986) (adopting Restatement definition of a defamatory statement). Thus, the District Court was correct to apply the principal to Long's claim.

Third, Long argues that, to the extent consent is a complete defense to a claim of defamation, his request for Secretarial review falls into the exception for "an honest inquiry or investigation by the person defamed to ascertain the existence, source, content or meaning of a defamatory publication." (App. Br. at 34 (citing Restatement (Second) of Torts § 584).) However, Long cannot credibly argue that his request for Secretarial review was an inquiry into the "source, content or meaning" of the alleged defamatory statements: Long knew the exact source, content and meaning of the defamatory statements because he had litigated over those statements for three years.[13] Instead, Long's request for review was designed to achieve one of two goals: to have the Secretary find that the AAR was

---

[13] Long devotes several pages of his brief to arguing that invited defamation should not apply because he had no reason to anticipate that "NMC would blatantly commit fraud in its submission to HHS" instead of responding "with the truth about Dr. Long and the contamination of his patients." (App. Br. at 38.) Thus, under Long's theory, invited defamation is only a defense if the defendant can also prove the truth of the statements asserted. But if this were the case, there would be no need for the defense of consent/invited defamation because truth is *always* a defense to defamation. The rule of consent/invited defamation provides a defense to defamation that does not require defendants to engage in the fact-intensive process of proving the truth of the matter asserted.

25

improperly filed (something the Secretary could not do under the applicable standard of review) or lure NMC into making statements for which it would be sued.  Neither results in a valid claim against NMC.

In short, as the District Court concluded, "this case would not exist but for Dr. Long's request for review by the Secretary."  (A-280 (Op. at 24).)  Having invited any defamation that may have occurred, Long is entitled to no damages allegedly resulting therefrom.

## III.    THE DISTRICT COURT CORRECTLY HELD THAT AMENDMENT OF PLAINTIFF'S COMPLAINT WOULD BE FUTILE.

Leave to amend is appropriately denied "for good reason, including futility, and faith, undue delay, or undue prejudice to the opposing part." *Holmes v. Grubman*, 568 F.3d 329, 344 (2d Cir. 2009).  Futility is a valid reason for denying a motion "[w]here the amended portion of the complaint would fail to state a cause of action." *The Standard Fire Ins. Co. v. Donnelly*, 689 F. Supp. 2d 696, 701 (D. Vt. 2010) (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000)).  *See also Heller v. Consol. Rail Corp.*, 331 F. App'x 766, 768 (2d Cir. 2009) ("a district court need not grant leave to amend if it can rule out any possibility, however unlikely it might be, that an amended complaint would succeed"); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.

1993)("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.").

Long's proposed Second Amended Compliant ("SAC") sought to add a claim for deceit against NMC and QHR, and sought to assert that same cause of action against a new party, Medical Mutual Insurance Company ("MMIC").[14] Specifically, the SAC alleges that NMC withheld from discovery in the 2005 Action the results of a culture taken by Long at his office on December 23, 2003. Long alleges that the results of that culture, which he claims somehow to have discovered in July 2013, some six months before he sought leave to amend, established that NMC intentionally contaminated his patients.   Long claims that if he had had the results of the culture in hand at the time he settled the 2005 Action, he would not have settled on the terms he did.

The District Court denied leave to amend the FAC on the grounds that Long's proposed additional claims did not adequately allege the elements of a claim for deceit, specifically the element that intentional misrepresentation was "not open to the defrauded party's knowledge."  (A-280 (Op. at 24 citing *Silva v. Stevens*, 589 A. 2d 852, 857 (Vt. 1991)).)  The District Court noted that, given that

---

[14] MMIC provided certain insurance coverage to NMC with respect to claims alleged by Long in the 2005 Action and participated in the settlement of that action.

Long had taken the December 23 culture himself, the results omission from production in the 2005 Action was open to his knowledge.  (A-281 (Op. at 25).)

Long's sole response is to argue that the fact that he knew the culture was *taken* does not mean that he knew the culture was *analyzed*, and therefore the existence of the culture results was not "open" to his knowledge.  (App. Br. at 44-45.)  But whether or not Long knew that the culture was actually analyzed is not dispositive.  The fact remains that Long knew the culture was taken, and therefore it was "open to his knowledge" that the culture results might exist.

Moreover, in settling the 2005 Action, Long released "all causes of action . . . and any and all claims and demands whatsoever, in law or equity, including but not limited to claims that I made or could have made in the [2005 Action]."  (A-237.)  Long also agreed the Release applied to "claims or causes of action against Releasees of which I am totally unaware and unsuspecting."  (A-237-38.)

That Long may have released his claims with less than all of the facts relating to that action is irrelevant.  Second Circuit courts have long rejected attempts to void releases on an alleged failure to disclose all facts and circumstances relating to the released claims.  In *Bellefonte Reinsurance Co. v. Argonaut*, 757 F.2d 523, 527 (2d Cir. 1984), the parties were involved in a dispute over the validity of reinsurance contracts.  Four years after the parties entered into a settlement agreement, plaintiff sued, claiming that defendant fraudulently

28

induced it to enter into the settlement agreement by failing to disclose material

facts about its fraudulent behavior. The Second Circuit rejected the claim:

> plaintiffs' argument is, in essence, that where the parties
> have sought to settle a claim of fraud, they cannot be
> bound by a settlement agreement unless the alleged
> defrauder has made full disclosure to the other party prior
> to the settlement. We know of no authority to that effect .
> . . .

757 F.2d 523, 527 (2d Cir. 1985).

*Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 192

(S.D.N.Y. 2008), reached a similar conclusion. In *Consorcio*, the parties executed

a settlement agreement with respect to competing claims regarding ownership of a

resort development in Mexico.  Later, plaintiffs claimed that they were

fraudulently induced into the settlement by the defendants' failure to disclose a

particular transaction that plaintiffs claim evidenced defendants' fraud.  The

District Court held that the release barred the plaintiffs' claims despite the alleged

nondisclosure, noting that the release applied "any and all actions . . . whether

known or unknown, contemplated or not contemplated . . . relating to or touching

upon (the Project)."  *Id.* at 191-92.

> [S]uch language of 'remarkable breadth' makes clear the
> parties' intent to release all claims, including those of
> fraudulent inducement.  Even if 'no semblance of fraud
> had come to light' before the releases were executed, 'it
> is clear that the parties…intended to settle fraud claims.'
> Plaintiffs have, in effect, settled all their 'fraud case[s]'

> against defendants relating to the Project, including those
> that have yet to be commenced.

*Id.* at 192 (internal citations omitted).

Any other result would open the floodgates. If a claim of less than complete responses to document requests — as has been made by Long here — is sufficient to upend a settlement, few parties would enjoy the certainty and respite that settlements are intended to provide. It was for precisely this reason that one court noted that "[t]he purpose of a settlement is to end litigation, not to provide a breather before the next round." *Tyson v. Cayton*, 784 F. Supp. 69, 75 (S.D.N.Y. 1992).

In sum, Appellant's request for leave to amend the FAC was properly denied as futile because Appellant could not satisfy the elements of a claim for deceit and because such claim was previously released.

## <u>CONCLUSION</u>

For all the foregoing reasons, Appellees respectfully request that the Court affirm the judgment of the District Court and grant such other and further relief as the Court deems proper.

Dated: August 22, 2014  <u>/s/ Karen Frink Wolf    </u>
              Karen Frink Wolf, Esq.
              Rachel M. Wertheimer, Esq.
              VERRILL DANA, LLP
              One Portland Square
              P.O. Box 586
              Portland, ME  04112-0586
              Tel: (207) 774-4000
              Fax: (207) 774-7499
              kwolf@verrilldana.com
              rwertheimer@verrilldana.com

              Attorneys for Appellees Quorum Health Resources, LLC and Northwestern Medical Center, Inc.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the foregoing brief is in 14-Point Times New Roman proportional font and contains 7,513 words and is this in compliance with the applicable type-volume limitation.

Dated: August 22, 2014          /s/ Karen Frink Wolf
                                Karen Frink Wolf, Esq.
                                Rachel M. Wertheimer, Esq.
                                VERRILL DANA, LLP
                                One Portland Square
                                P.O. Box 586
                                Portland, ME  04112-0586
                                Tel: (207) 774-4000
                                Fax: (207) 774-7499
                                kwolf@verrilldana.com
                                rwertheimer@verrilldana.com

                                Attorneys for Appellees Quorum Health
                                Resources, LLC and Northwestern Medical
                                Center, Inc.

# APPENDIX A

Cross-Reference of Bowen Report to 2005 Action

| | | |
|---|---|---|
| March 8, 2004 | Written request for consideration of corrective action by Northwestern Medical Center ("NMC") Chief Executive Officer Peter Hofstetter ("CEO") to James Duncan, MD, President of NMC Medical Staff ("Medical Staff President").<br><br>(CEO Letter (without supporting documentation) attached as Exhibit A)(Hereinafter "CEO Request"). | 2005 Compl. ¶ 317; 2006 Compl. ¶ 392 |
| March 12, 2004 | The NMC Medical Executive Committee ("MEC") met in Executive Session to discuss the CEO Request and voted to forward the CEO Request to Joseph Salomone, MC, NMC Chief of Surgical Services ("Surgical Services Chief"), for investigation and recommendation. | 2005 Compl. ¶ 323[15]; 2006 Compl. ¶ 411 |
| March 12, 2004 | The Surgical Services Chief formed and convened and Ad Hoc Committee of Surgical Services ("Ad Hoc Committee") to carry out the investigation requested by the MEC.  The Ad Hoc Committee scheduled its next meeting for March 15, 2004. | 2005 Compl. ¶ 323; 2006 Compl. ¶ 412 |
| March 15, 2004 | Ad Hoc Committee meeting to continue investigation which resulted in specific recommendations to MEC. | 2005 Compl. ¶ 323; 2006 Compl. ¶ 430 |
| March 16, 2004 | Written recommendation of Ad Hoc Committee.<br><br>*(Ad Hoc Committee written recommendation to MEC attached as Exhibit B) ("Ad Hoc Committee Recommendation").* | 2005 Compl. ¶ 323; 2006 Compl. ¶ 436 |

---

[15] In the 2005 Complaint, Long mistakenly alleges that the Ad Hoc Meeting occurred on March 16, 2004.  (2005 Compl. ¶ 323.)

33

| | | |
|---|---|---|
| March 22, 2004 | MEC Executive Session where MEC accepted the recommendation of the Ad Hoc Committee and outlined process for MEC to complete its investigation. | 2005 Compl. ¶ 312; 2006 Compl. ¶ 439 |
| April 5, 2004 | Special meeting of MEC to continue corrective action investigation.<br><br>*(MEC Memorandum a/Decision attached as Exhibit C).* | 2005 Compl. ¶ 324-35; 2006 Compl. ¶ 463 |
| April 6, 2004 | CEO letter to Raymond Long MD.<br><br>Notice of Memorandum of Decision and that failure to comply with recommended actions would result in summary suspension by MEC of Medical Staff privileges; includes notice of hearing rights.<br><br>*(CEO letter to Dr. Long attached as Exhibit D).* | 2005 Compl. ¶ 329-31; 2006 Compl. ¶ 473-74 |
| April 7, 2004 | Dr. Long submits written letter of resignation from NMC Medical Staff to CEO.<br><br>*(Dr. Long letter of resignation attached as Exhibit E).* | 2005 Compl. ¶ 337; 2006 Compl. ¶ 480 |
| April 30, 2004 | NMC files an AAR with NPDB. | 2005 Compl. ¶ 344; 2006 Compl. ¶ 486 |